No. 23-60381

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————————

SPRING SIDERS,

> Plaintiff - Appellant,

    v.

CITY OF BRANDON, MISSISSIPPI,

> Defendant - Appellee.

———————————————

Appeal from the United States District Court
Southern District of Mississippi

———————————————

**APPELLANT'S BRIEF**

———————————————

NATHAN W. KELLUM
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485

**Attorney for Appellant**

## **RULE 28.2.1 CERTIFICATE OF INTERESTED PERSONS**

(1) No. 23-60381, *Spring Siders v. City of Brandon, Mississippi*

(2) The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest

in the outcome of the case. These representations are made in order that the

judges of this court may evaluate possible disqualification or recusal.

    a. Plaintiff-Appellant Spring Siders states that she is not a subsidiary

       or an affiliate of a publicly owned corporation.

    b. On behalf of Plaintiff-Appellant, the following attorney associated

       with the law firm Center for Religious Expression has appeared:

       Nathan W. Kellum.

    c. Defendant-Appellee City of Brandon, Mississippi is not a subsidiary

       or an affiliate of a publicly owned corporation.

    d. On behalf of Defendant-Appellee, the following attorneys have

       appeared: G. Todd Butler, Mallory K. Brand.

/s/ Nathan W. Kellum               October 3, 2023
Nathan W. Kellum, on behalf of      Date
Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 5th Cir. R. 28.2.3, Plaintiff-Appellant Spring Siders requests oral argument for this appeal challenging Defendant-Appellee City of Brandon's application of § 50-45 to her religious speech. As construed, the ordinance prohibits every conceivable method of Siders' evangelism – distributing literature, holding signs, wearing expressive clothing, conversing, and praying – from public sidewalks and ways in a public park, relegating her speech to a remote "protest" box area where she faces even more restrictions, all serving to keep her message from her audience.

Oral dialogue with counsel should benefit the Court in assessing the propriety of the ordinance as it applies to these expressive activities.

# **TABLE OF CONTENTS**

RULE 28.2.1 CERTIFICATE OF INTERESTED PERSONS ................................. ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS ....................................................................................iv

TABLE OF AUTHORITIES .............................................................................vi

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF ISSUES ....................................................................................1

STATEMENT OF CASE ........................................................................................2

SUMMARY OF ARGUMENT ............................................................................11

STANDARD OF REVIEW ..................................................................................13

ARGUMENT ........................................................................................................13

   I.    SIDERS DEMONSTRATES A SUBSTANTIAL LIKELIHOOD OF
        SUCCESS ON THE MERITS OF HER CONSTITUIONAL CLAIMS ...14

      A. Brandon Violates Siders' Right to Free Speech ...………………….....14

          1.    Siders' religious speech is constitutionally protected...............15

          2.    Sidewalks and grassy curtilage in Quarry Park bordering Boyce
               Thomson Drive are traditional public fora ...............................16

          3.    Application of § 50-45 to Siders' religious speech is not a
               reasonable time, place, and manner restriction.........................18

               a.    ban on every form of religious expression in traditional
                     public fora is not narrowly tailored to meet a significant
                     government interest .......................................................19

               b.    displacing speech to a remote "protest" area with severe
                     limitations does not leave open alternative channels of
                     communication ..............................................................24

               c.    regulation on "protests" is a content-based restriction...27

B. Brandon Violates Siders' Right to Due Process…………………………31

II.    SIDERS FACES SUBSTANTIAL IRREPARABLE HARM ...................34

III.    HARM TO SIDERS OUTWEIGHS ANY HARM TO BRANDON.........34

IV.    PRELIMINARY INJUNCTION WOULD NOT DISSERVE PUBLIC INTEREST ...............................................................................................35

CONCLUSION ..................................................................................................35

CERTIFICATE OF SERVICE ..............................................................................36

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................36

# TABLE OF AUTHORITIES

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998)........................................................................18

*Bays v. City of Fairborn*,
    668 F. 3d 814 (6th Cir. 2012) ................................................. 23, 24

*Blitch v. City of Slidell*,
    260 F.Supp.3d 656 (E.D. La. 2017) ............................................28

*Boos v. Barry*,
    485 U.S. 312 (1988)........................................................................16

*Bose Corp. v. Consumers Union*,
    466 U.S. 485 (1984).......................................................................13

*Brock Services, LLC v. Rogillio*,
    936 F.3d 290 (5th Cir. 2019) .......................................................14

*Buchanan v. Alexander*,
    919 F.3d 847 (5th Cir. 2019) .......................................................13

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ................................................. 13, 14

*Capitol Square Rev. and Advisory Bd. v. Pinette*,
    515 U.S. 753 (1995).......................................................................15

*City of Austin v. Reagan Nat'l Adv. of Austin, LLC*,
    142 S.Ct. 1464 (2022)................................................ 27, 29, 30, 31

*City of Chicago v. Morales*,
    527 U.S. 41 (1999).........................................................................33

*City of Houston v. Hill*,
    482 U.S. 451 (1987).......................................................................16

*City of Lakewood v. Plain Dealer Pub'g Co.*,
　　486 U.S. 750 (1988) ........................................................................32

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
　　473 U.S. 788 (1995)..........................................................................15

*Cox v. Louisiana*,
　　379 U.S. 536 (1965)..................................................................... 15, 16

*DeBoer v. Vill. of Oak Park*,
　　267 F.3d 558 (7th Cir. 2001) ...........................................................15

*Edwards v. City of Coeur d'Alene*,
　　262 F.3d 856 (9th Cir. 2001) ...................................................... 24, 26

*Elrod v. Burns*,
　　427 U.S. 347 (1976)..........................................................................34

*Fairchild v. Liberty Indep. Sch. Dist.*,
　　597 F.3d 747 (5th Cir. 2010) ...........................................................17

*Forsyth County v. Nationalist Movement*,
　　505 U.S. 123 (1992)..........................................................................29

*Foti v. City of Menlo Park*,
　　146 F.3d 629 (9th Cir. 1998) ...........................................................22

*Frame v. City of Arlington*,
　　657 F.3d 215 (5th Cir. 2011) ...........................................................17

*Frisby v. Schultz*,
　　487 U.S. 474 (1988)..........................................................................16

*Gathright v. City of Portland*,
　　439 F.3d 573 (9th Cir. 2006) ...........................................................18

*Gerritsen v. City of Los Angeles*,
　　994 F.2d 570 (9th Cir. 1993) ...........................................................23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)......................................................................14

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................32

*Hague v. CIO*,
    307 U.S. 496 (1939)................................................................ 11, 17

*Heffron v. Int'l Soc'y for Krishna Consciousness*,
    452 U.S. 640 (1981)........................................................... 16, 24, 25

*Herridge v. Montgomery County*,
    No. 21-20264, 2022 WL 989421 (5th Cir April 1, 2022) ..................... 11, 23

*Hill v. Colorado*,
    530 U.S. 703 (2000).......................................................... 16, 30, 31

*Hoffman Estates v. Flipside, Hoffman Estates*,
    455 U.S. 489 (1982)......................................................................32

*J & B Entm't, Inc. v. City of Jackson*,
    152 F.3d 362 (5th Cir. 1998) .........................................................14

*Johnson v. Minneapolis Park and Recreation Bd.*,
    729 F.3d 1094 (8th Cir. 2013) ................................................... 18, 23

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ....................................................35

*Knowles v. City of Waco*,
    462 F.3d 430 (5th Cir. 2006) .......................................................19

*Lee v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    505 U.S. 830 (1992).............................................................. 21, 22

*Mahoney v. Babbitt*,
    105 F.3d 1452 (D.C. Cir. 1997).....................................................18

*McCullen v. Coakley*,
  573 U.S. 464 (2014).................................................................. 19, 23

*Minnesota Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018)....................................................................16

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943).........................................................................16

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ................................................... 34, 35

*Parks v. City of Columbus*,
  395 F.3d 643 (6th Cir. 2005) ..........................................................18

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983)................................................................... 19, 24

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015).................................................. 27, 28, 30, 31

*Reeves v. McConn*,
  631 F.2d 377 (5th Cir. 1980) .........................................................24

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995).........................................................................27

*Schneider v. Town of Irvington*,
  308 U.S. 147 (1939).........................................................................31

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) ......................................... 18, 32, 33

*United Broth. of Carpenters and Joiners of Am. Local 586 v. N.L.R.B*,
  540 F.3d 957 (9th Cir. 2008) .........................................................22

*United States v. Belsky*,
  799 F.2d 1485 (11th Cir. 1986) .....................................................21

*United States v. Grace*,
461 U.S. 171 (1983)................................................................. 17, 22

*United States v. Hayes Int'l Corp.,*
415 F.2d 1038 (5th Cir. 1969) ...........................................34

*United States v. Kokinda*,
497 U.S. 720 (1990)................................................................21

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)................................................................19

*Weinberg v. City of Chicago*,
310 F.3d 1029 (7th Cir. 2002) ...........................................24

*Whole Women's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018) ....................................... 13, 15

*Wiley v. Harris Cty. Dist. Atty.*,
27 F.4th 1125 (5th Cir. 2022) ...........................................13

## **STATEMENT OF JURISDICTION**

Plaintiff-Appellant Spring Siders (Siders) brings constitutional claims against Defendant-Appellee City of Brandon, Mississippi (Brandon), asserting violations of free speech and due process under the First and Fourteenth Amendments to the United States Constitution, seeking relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983. This Court has federal jurisdiction under 28 U.S.C. §§ 1331 and 1343 and appellate jurisdiction through 28 U.S.C. § 1292. The district court denied Siders' motion for preliminary injunction, and, from this Order, Olivier filed a timely notice of appeal.

## **STATEMENT OF ISSUES**

1.      Does a ban on Siders' signs, leafletting, expressive apparel, conversation, and prayer in traditional public fora, confining her religious message to a remote box area some 265 feet away from pedestrian traffic flow, violate Siders' right to free speech?

2.      Does a restriction that bars Siders from using a pole or a stick for a sign, a step stool while holding her sign, or from hoisting a sign with the top any higher than four feet above her head, within the remote box area, violate Siders' right to free speech?

3.     Does application of a city ordinance that facially regulates "protests" and "demonstrations" to Siders' religious expression, including her conversations and prayer, violate Siders' right to due process?

## STATEMENT OF CASE

### *Siders' Desire to Engage in Religious Expression in Quarry Park*

Siders is a Christian who wants to share the gospel of Jesus Christ with others. (ROA. 7, 27).[1]   Toward this end, Siders, along with her husband and friends, goes to public places outside of well-attended events where she can find a prospective audience for her religious message.  (ROA. 8, 27).  Siders does not wish to preach; rather, she uses signs, banners, literature, expressive clothing, conversation, and individualized prayer to convey her Christian beliefs.  (ROA. 8, 27-28).

Siders especially wants to share her faith on public sidewalks and grassy areas bordering Boyce Thompson Drive in Quarry Park near the intersection with Rock Way, the main entryway to the Brandon Amphitheater, on days when events are occurring at the amphitheater.  (ROA. 9, 28, 510).  In these spots and at these times, Siders can find meaningful traffic flow and audience. (ROA. 9, 28-29). Siders' singular purpose for going to the public ways in Quarry Park is to evangelize.  (ROA. 510). She does not wish to protest, demonstrate, or speak on any political or social

---

[1] Citations to record are designated as "ROA." and to record excerpts as "RE."

2

topic.  (ROA. 510).

## *Brandon Passes § 50-45 to Curb Religious Speech*

Brandon owns Quarry Park and the Brandon Amphitheater.  (ROA. 9).  To curb religious speech like that of Siders outside the amphitheater, on December 2, 2019, the City passed ordinance § 50-45 entitled: "Designating a protest area and related provisions during events at the Brandon Amphitheater." (ROA. 9-11, 35-36; RE. 31-32).  Section 50-45 and its Exhibit "A" showing an aerial shot of Quarry Park and the restricted area set aside for speech activity are as follows:

## Sec. 50-45. Designating a protest area and related provisions regarding public protests/demonstrations during events at the Brandon Amphitheater.

(a)  Three hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("event") and one hour after the conclusion of the event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the restricted area shown in exhibit "A" attached hereto, except in the designated protest area as shown on exhibit "A" attached hereto.

(b)  The protest area is available to individuals and/or groups during the time specified in subsection (a) above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

  (1)  All individuals and/or groups shall be and remain wholly within the protest area while actively engaged in public protests and/or demonstrations. Vehicles are prohibited in the protest area;

  (2)  The use of lasers, blinking or blinding lights, electric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

  (3)  The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the protest area is located is prohibited;

  (4)  Libel, slander, obscenities, and/or speech than incites imminent violence or law breaking is prohibited;

3

(5) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

(6) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited. All signs must be hand-held and shall not be affixed to anything in the protest area or otherwise affixed to the protest area. The top of any sign may not be elevated more than four feet beyond the height of its holder.

(7) Anything brought onto the protest area shall be removed within 75 minutes of the conclusion of an event.

(8) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the protest area. The representative shall, when reasonably requested by the chief of police and/or his designee, provide photo identification.

Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the protest area photo identification and provide the same to the chief of police and/or his designee as and when reasonably requested. Requests for identification by the chief of police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(c) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the protest area and is not be permitted to return to the protest area during the event on the day of the violation and if the same individual violates the provisions herein again during an event in the same calendar year, the individual shall be removed from the protest area and is not be permitted to return to the protest area during any event for the remainder of that calendar year.

Exhibit "A"



(*Id.*).

Through § 50-45, Brandon relegates any expressive activity it deems a "protest" or "demonstration" to a designated, remote "protest" area on amphitheater event days and precludes any such expressive activity from occurring outside of this area. (*Id.*). This protest area sits around 265 feet away from the intersection where a vast majority of attendees traverse to get to the amphitheater and where Siders wishes to engage in her religious speech. (ROA. 9-11, 14, 30, 35-36; RE. 31-32). The space is about 29 x 16 feet in size. (ROA. 14, 30). Within it, § 50-45 requires

that all signs be hand-held signs without poles or sticks and prohibits individuals from holding signs so that the top of the sign is any higher than 4 feet above the height of the holder.  (ROA. 9-11, 35-36; RE. 31-32).  Also, no one can elevate a sign by standing on a step stool in the "protest" area.  (*Id.*).

### *Brandon Applies § 50-45 to Eliminate Siders'*
### *Religious Speech on Public Ways in Quarry Park*

Due to a string of COVID 19-related cancellations of events in 2020 and 2021, Siders did not encounter § 50-45 until she visited Quarry Park on May 1, 2021, for a Lee Brice concert.  (ROA. 11-12, 29).  She heard about a new ordinance regulating speech in Quarry Park during amphitheater events but did not believe the City would restrict her protected speech in public places.  (ROA. 13, 29).  Siders and her husband arrived before the concert began that evening, at around 6:00 p.m., and parked in lot B to meet friends, including Gabriel Olivier (Olivier). (ROA 12, 29).  Siders brought with her gospel literature and a sign reading "Prepare to meet thy God" as well as a banner stating, "repent or perish."  (*Id*.).  Olivier and other members of the group also brought signs, literature, and expressive clothing.  (ROA. 12).

Soon after arrival, Siders noticed Chief Thompson and another police officer driving up in a golf cart toward the group. (ROA. 12, 29).  The chief apprised them of § 50-45 and handed out a copy of the ordinance along with the map revealing the designated area for their speech.  (ROA. 12-13, 29). The chief explained Brandon had set aside a "special" spot for Siders' group, adding that Siders and company

6

should not hear from the police unless they failed to follow the rules. (ROA. 13).

Though Siders did not come to protest, along with the rest of the group, she decided to check out the designated spot for their speech, anticipating a space somewhere near the intersection with Rock Way, where they could reach people. (ROA. 13, 30).  But Siders did not see a designated space near the intersection. (ROA. 14, 30).  Eventually, she spotted a marked-off space sitting hundreds of feet to the west of them and started walking in that direction. (*Id*.).  And as she drew closer, Siders confirmed the space was the "protest" area described in § 50-45, noticing ropes setting out the boundaries.  (*Id.*).

Inspecting the spot, Siders determined the protest area could not work for her communication purposes, no matter what means she employed to convey her message.  (ROA. 14-15, 30-31).  The box places Siders too far away from pedestrians to effectively leaflet, converse, or pray with people.  (ROA. 15, 30, 35-36; RE. 31-32).  Section 50-45 also nullifies expressive t-shirts because attendees cannot see them while constrained in the boxed area.  (ROA. 15, 31, 35-36; RE. 31-32).  Moreover, the ordinance's prohibition on poles, sticks, step stools, and tops of signs greater than 4 feet of the height of the speaker keeps Siders as well as others from effectively using signs and banners.  (ROA. 15, 31, 35-36; RE. 31-32).

Siders questioned whether they had to remain in the "protest" box area since they were neither protesting nor demonstrating. (ROA. 16, 31).  She wanted to be in

a spot where her evangelistic message would be received. *(Id.)*. Consequently, Siders and the rest of the group walked from the protest area to their desired spots on both sides of Boyce Thompson Drive near the intersection with Rock Way. (*Id.*). Siders and Olivier's wife, Christina, went to the south side of Boyce Thompson Drive and stood on the edge of the sidewalk and the grassy area next to it, while Siders' husband, Olivier, and the others went to the north side of the street. (*Id.*). From her location, Siders could communicate her message with attendees as they walked from parking lots to the amphitheater. (ROA. 31-32).

However, a Brandon police officer soon approached and reminded the group of § 50-45 and the designated spot the City had set up for them. (ROA. 16, 32). Siders did not want to go back to the protest area, believing she should be free to share her message from the public area where she was standing. (ROA. 17, 32). But the officer insisted the group go back to the box (ROA. 17) and contacted his supervisor, Chief Thompson, to enforce the restriction. (ROA. 17, 32). As they waited on the chief, some members of Siders' group shared their message. (*Id.*). One individual held up a banner, another preached on the edge of sidewalk, while Siders held up a sign and her literature. (*Id.*).

Chief Thompson soon arrived. (ROA. 18, 32). To see how the chief would handle the situation, Siders walked across the street to where he was located. (ROA. 19, 32). Chief Thompson told Olivier that he would enforce the ordinance against

the group and require them to go back to the designated spot. (ROA. 18). Olivier countered that they were there to share the gospel and could not do so effectively in the "protest" spot, pointing out they were not protesting. (*Id*.). But the chief was resolute, explaining that they (the police) do not make laws but enforce them. (*Id.*). The chief warned the group that they had to go back to the designated protest area or leave the park. (*Id.*). Olivier advised that he was trying to figure out what to do, but was confused by the stance, not seeing how Brandon could prohibit their speech on public ways. (*Id.*). Unwilling to delve into the constitutionality of the restriction, the chief repeated the options. (*Id.*).

Olivier asked Chief Thompson if the request was made under the threat of arrest and the chief assured the threat was genuine. (*Id.*). Olivier then asked the chief if he would really arrest someone for speaking on a public sidewalk. (ROA. 19). At this point, Chief Thompson abruptly instructed a police officer to make an arrest. (*Id.*). The chief then retrieved his handcuffs to arrest Olivier, and asked Siders and others in the group if they wanted to leave. (ROA. 19, 32). Fearing arrest, Siders and her husband quickly departed. (*Id*.). Seeing the police arrest Olivier and another member of her group, Siders believed they would have arrested her next had she not left. (ROA. 32).

Siders still desires to share her evangelistic message on public sidewalks and ways bordering Boyce Thompson Drive near Rock Way on amphitheater event days.

(ROA. 19, 32).  Yet she is chilled and deterred from returning to the park and expressing her Christian beliefs in those venues due to Brandon's demonstrable willingness to apply § 50-45 against her speech.  (*Id*.).  She refrains from speaking in the park during events for fear of criminal arrest and sanction. (ROA. 19).

### *Siders Pursues Relief in Court*

To obtain relief from the ongoing infringement on her speech, Siders filed verified complaint against Brandon, challenging application of § 50-45 to her signs, literature, expressive clothing, conversation, and prayer on public ways.  (ROA. 6-18).  On the same date, Siders filed a motion for preliminary injunction, along with exhibits and memorandum, to enjoin Brandon from applying § 50-45 to her religious speech. (ROA. 25-55).  Brandon subsequently filed an answer (ROA. 412-424) and a response in opposition to the motion for preliminary injunction, with accompanying exhibits and memorandum.  (ROA. 64-411).  Siders followed with reply and additional exhibits.  (ROA. 495-536).

Brandon also filed a motion for judgment on the pleadings, or, alternatively, for summary judgment, submitting duplicative motions and memoranda, and relying on the same exhibits it filed in response to Siders' motion for preliminary injunction. (ROA. 425-494). Siders tendered her opposition to the alternative motions (ROA. 537-582) and Brandon sought leave to file excess pages (ROA. 583-85) in filing duplicative replies in support.  (ROA. 566-593).

10

***The District Court Denies Siders' Relief and Siders Appeals the Order***

On June 16, 2023, the district court entered an Order denying Siders' motion for preliminary injunction as well as Brandon's motion for summary judgment. (ROA. 599-621; RE. 8-30). In respect to the preliminary injunction, the court, in a brief analysis, cited *Herridge v. Montgomery County*, No. 21-20264, 2022 WL 989421 (5th Cir April 1, 2022) as the basis for finding Siders had not yet established a substantial likelihood on the merits of her claims. (ROA. 620-21; RE. 29-30). The court denied Brandon's motion on the pleadings as moot. (ROA. 621; RE. 30).

Subsequently, on July 11, 2023, Siders filed a timely notice of appeal from this Order denying her motion for preliminary injunction. (ROA. 622-623; RE. 6-7).

## SUMMARY OF ARGUMENT

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). Brandon flouts this fundamental principle with its application of § 50-45 to Siders' religious speech, barring her from handing out literature, holding a sign, wearing an expressive t-shirt, partaking in conversations, or engaging individuals in prayer, in public ways of a public park.

11

The application of § 50-45 violates Siders' right to free speech. The enforcement is not narrowly tailored to address any true concerns over public safety. Though the ordinance purportedly regulates "protests" and "demonstrations," Brandon wields it to purge Siders' harmless means of religious expression from traditional public fora, leaving her with no avenue for reaching her intended audience with her message. Moreover, the ordinance invalidly targets content with its regulation of "protests," an expressive activity marked by the espousal of disapproval of something.

Additionally, the application of § 50-45 to Siders' religious speech violates her right to due process. Siders has no intention of protesting or demonstrating, she only wants to evangelize, share her Christian faith. The ordinance fails to give her fair notice that she risks criminal arrest by engaging in this protected speech in public fora.

For these reasons, Siders is likely to prevail on her challenge to Brandon's application of § 50-45 to her religious expression. Causing Siders to suffer ongoing irreparable harm, she seeks prospective relief to enjoin application of the ordinance to her. This relief would present no harm to Brandon, only requiring the City to respect her constitutional freedoms. And given the public's great interest in these freedoms, Siders meets all the requirements for a preliminary injunction, entitling her to receive this relief.

12

On appeal, Siders asks this Court to reverse the district court ruling below and direct the court to grant her motion for preliminary injunction, so she can secure the relief she needs as soon as practicable.

## STANDARD OF REVIEW

The standard of review for this appeal of the district court's Order denying Siders' motion for preliminary injunction is *de novo*. "Whether free speech rights have been infringed presents a mixed question of law and fact reviewed *de novo*, and when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed *de novo*." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citation omitted). *See Wiley v. Harris Cty. Dist. Atty.*, 27 F.4th 1125, 1128-29 (5th Cir. 2022) (quoting *Byrum* in holding denial of preliminary injunction is reviewed *de novo* when it concerns a free speech claim).

In the First Amendment context, an appellate court examines the record as a whole without deference to the lower court. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984); *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019). This high level of scrutiny is necessary to ensure "the judgment does not constitute a forbidden intrusion on the field of free expression." *Whole Women's Health v. Smith*, 896 F.3d 362, 369 (5th Cir. 2018) (citations omitted).

## ARGUMENT

A preliminary injunction is warranted when the movant can establish (I) a

substantial likelihood of success on the merits; (II) an irreparable injury in the absence of the injunction; (III) the injury outweighs any harm to the other party; and (IV) that granting the preliminary injunction will not disserve the public interest. *Brock Services, LLC v. Rogillio,* 936 F.3d 290, 296 (5th Cir. 2019). Siders makes the requisite showings here.

## I.   SIDERS DEMONSTRATES A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF HER CONSTITUIONAL CLAIMS

"[W]hen considering the likelihood of success, the district court should [] inquire[] whether there is a sufficient likelihood the [city] will ultimately fail to prove its regulation constitutional." *Byrum*, 566 F.3d at 446 (citation omitted). The government defendant bears the burden of justifying a speech restriction, and if unable to meet this burden, the plaintiff is considered likely to succeed on the merits of the claim. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *J & B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 370-71 (5th Cir. 1998).

In that Brandon cannot meet its burden of showing the application of § 50-45 to Siders' religious speech is constitutional, Siders is likely to prevail in this cause, demonstrating a violation of her A) right to free speech and her B) right to due process.

### A.    Brandon Violates Siders' Right to Free Speech

The propriety of Brandon applying the restrictions in § 50-45 to Siders'

14

religious expression is guided by forum analysis, with the Court determining 1) whether the expressive activity merits constitutional protection 2) the nature of the forum sought by the speaker, and from this evaluation, assigning and applying 3) the appropriate level of scrutiny to judge the speech restriction. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1995).  A working-through of this analysis confirms Brandon's application of the ordinance to Siders treads on too much of her protected speech.

### 1. Siders' religious speech is constitutionally protected

Siders wants to spread the good news about Jesus Christ with others, extolling the benefits of the Christian faith through signs, banners, literature, expressive clothing, one-on-one conversations, and individualized prayer.

The Christian-oriented content Siders wishes to impart to others falls within the free speech clause of the First Amendment to the U.S. Constitution. *See Capitol Square Rev. and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (plurality) (religious views protected); *Whole Women's Health*, 896 F.3d at 376  as revised (July 17, 2018) (Ho, J., concurring) (religious speech protected). To be sure, religious expression "holds a place at the core of the type of speech the First Amendment was designed to protect." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 570 (7th Cir. 2001). And the protection afforded this speech is sure, unaffected by how well others receive or respond to it. *Cox v. Louisiana*, 379 U.S. 536, 551-52 (1965). That some

individuals may object to religious viewpoints does not transform the messaging into "fighting words" or otherwise diminish the protection due the speech. *See Hill v. Colorado*, 530 U.S. 703, 715 (2000) ("The fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection"); *City of Houston v. Hill*, 482 U.S. 451, 462 n. 11 (1987) ("may as well forget about free speech" if hostile response is allowed to censor expression). To the contrary, "free speech best serves its high purpose when the ideas conveyed invite dispute." *Cox*, 379 U.S. at 551-52 (citation omitted).

Aside from content, Siders' means for communicating her religious beliefs is safeguarded by the First Amendment as well. *See Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (expressive apparel); *Boos v. Barry*, 485 U.S. 312, 318 (1988) (signs); *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981) (oral and written dissemination of religious views); *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) (distribution of religious literature).

### 2. Sidewalks and grassy curtilage in Quarry Park bordering Boyce Thomson Drive are traditional public fora

The level of scrutiny applied to a speech restriction depends on the venue where the speech is sought. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988). Siders wants to share her religious message on the outer edge of public sidewalks or on grassy curtilage within Quarry Park located on either side of Boyce Thompson Drive close to the intersection with Rock Way.

16

The Fifth Circuit recognizes four types of fora for speech purposes: traditional public fora, designated public fora, limited public fora, and nonpublic fora. *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757-58 (5th Cir. 2010). The sidewalks and grassy areas where Siders seeks to be and speak are traditional public fora. "Public sidewalks are traditional public fora that time out of mind have facilitated the general demand for public assembly and discourse." *Frame v. City of Arlington*, 657 F.3d 215, 227-28 (5th Cir. 2011) (citation and quotation marks omitted). Likewise, public parks, like Quarry Park, where the sidewalks and grassy curtilage are found, are traditional public fora. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515.

This traditional public forum status assigned to sidewalks and parks is deep-rooted and fixed. *United States v. Grace*, 461 U.S. 171, 180 (1983). Therefore, the presence of a nearby event in the amphitheater cannot change it. *Id*. ("Traditional public forum occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression"). As long as public spaces remain free and open to the public, they

17

remain traditional public fora.  *See Johnson v. Minneapolis Park and Recreation Bd.*, 729 F.3d 1094, 1098-99 (8th Cir. 2013) (public park stayed traditional public forum during free and open festival); *Gathright v. City of Portland*, 439 F.3d 573, 578-79 (9th Cir. 2006) (public sidewalks and parks retained traditional status during public events); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (public streets did not lose traditional forum status during free art festival); *Mahoney v. Babbitt*, 105 F.3d 1452, 1457-58 (D.C. Cir. 1997) (public sidewalks remained traditional public fora despite government agency retention of permit covering the area for public parade).

The moniker of a traditional public forum carries significant weight.  A government entity is "sharply circumscribed" from regulating expression in this type of forum.  *Serv. Emps. Int'l Union, Local 5 v. City of Houston [SEIU],* 595 F.3d 588, 595 (5th Cir. 2010) (citation omitted).  These spaces are "open for expressive activity regardless of the government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).[2]

### 3. Application of § 50-45 to Siders' religious speech is not a reasonable time, place, and manner restriction

Siders challenges § 50-45 as applied to her religious speech.  To survive

---

[2] The district court acknowledged the areas where Siders wants to speak are traditional public fora.  (ROA. 612; RE. 21).

constitutional scrutiny, a governmental restriction on protected speech in traditional public fora must "be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). If a restriction is content based, it is subject to strict scrutiny, that is, the government entity "must show that its [restriction] is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* Brandon cannot meet either standard.

### a. ban on every form of religious expression in traditional public fora is not narrowly tailored to meet a significant government interest

Narrow tailoring requires a speech restriction not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). In other words, a valid restriction can eliminate no more than "the exact source of evil that it seeks to remedy." *Knowles v. City of Waco*, 462 F.3d 430, 434 (5th Cir. 2006) (citation and internal quotation marks omitted). To keep a government entity from sacrificing too much speech for the sake of convenience, the tailoring requirement demands a "close fit between the ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Brandon's ban fails in this respect, going far beyond constitutional parameters.

Brandon applies § 50-45 to every conceivable mode of expression Siders can

muster by labelling all of it as a protest or demonstration.  It applies the ordinance to her individually as well as to groups and regulates grassy areas as well as the public sidewalks within a public park.  In effect, § 50-45 keeps Siders from engaging in any means of her religious expression – whether it involves literature distribution, sign display, expressive clothing, conversation, or prayer – on public sidewalks and public ways inside Quarry Park.  Brandon cannot begin to justify this extraordinarily broad infringement on Siders' speech.

The City does not specify an interest in the text of § 50-45 for the all-encompassing restriction on any speech the City deems a protest or demonstration. In the proceedings below, the City claimed an interest in public safety, which can be a legitimate concern in theory, but Brandon failed to substantiate why it must censor Siders' speech in the name of public safety.  Indisputably, Siders does not physically obstruct traffic flow on the sidewalk as she stands on the edge of the pathway or in the grassy curtilage.  Brandon just assumes pedestrians will stray away from sidewalks and recklessly walk into Boyce Thompson Drive without looking for oncoming vehicular traffic just to avoid exposure to any form of religious messaging.  The justification is lacking.  Even if the City could show people walk wider of Siders to avoid her speech (of which there is no evidence), this circumstance could not lend credence to a legitimate safety concern.  Anyone altering the trajectory of their path does so at their own leisure.  What's more, Brandon fails to

establish how a change in pedestrian traffic pattern, if such ever occurs, could impact public safety.

Brandon has submitted no evidence tying Siders' expressive activity to a threat to public safety. The City introduced below a series of extensive traffic circulation studies (ROA. 72-227) it conducted for consecutive amphitheater events in 2018, supplying a detailed account of vehicular and pedestrian traffic patterns before and during events. But more than what they say, these studies are telling for what they do not say. The studies do not suggest religious speech like Siders causes traffic problems. Rather, to improve pedestrian traffic flow, the studies recommend Brandon provide on-street lighting, remove a concrete island at Boyce Thompson Drive, place a Type 3 barricade on the street, stripe the street for 3 lanes, create a multi-use path, and place bollards on pedestrian path. And in lieu of adopting these measures, Brandon opted to bar religious speech near the intersection of Boyce Thompson Drive and Rock Way.

In reality, Siders' expressive activity does not impair traffic flow. Leafletting is not prone to draw a crowd or otherwise cause congestion. *United States v. Kokinda*, 497 U.S. 720, 734 (1990) (plurality). "A passerby can take a pamphlet and keep walking." *United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir. 1986). For this reason, the Supreme Court has held bans on literature distribution unconstitutional even in nonpublic fora. *See, e.g., Lee v. Int'l Soc'y for Krishna*

*Consciousness, Inc.*, 505 U.S. 830, 831 (1992) (*per curiam*, adopting O'Connor J., concurrence, 505 U.S. 695) (invalidating ban on leafletting in airport terminal). Similarly, sign display and expressive clothing do not generate legitimate obstruction or safety concerns. People need not stop and block traffic to read a sign or a t-shirt since they can read the message as they walk by it. *See United Broth. of Carpenters and Joiners of Am. Local 586 v. N.L.R.B*, 540 F.3d 957, 968-69, 971 (9th Cir. 2008) (holding ban on sign display not narrowly tailored to prevent traffic flow diverting from sidewalk into street); *Foti v. City of Menlo Park*, 146 F.3d 629, 642 (9th Cir. 1998), as amended on denial of reh'g (July 29, 1998) (holding ban on stationary display of signs on public sidewalk not narrowly tailored to address congestion because pedestrians could easily pass a stationary person carrying a sign).

The Supreme Court, in *United States v. Grace*, invalidated a comparably oppressive restriction that barred literature distribution and signs on sidewalks surrounding Supreme Court grounds, noting "an insufficient nexus with any of the public interests that may be thought to undergird [the restriction]." 461 U.S. at 181. Finding the expressive activity could not itself obstruct sidewalks or access to them, the Court held the ban on these activities eliminated more speech than any valid interest could support. *Id.* at 182. The Sixth Circuit drew the same conclusion about a like restriction on "solicitation of causes" that had the effect of precluding sign display, literature distribution, conversation, and preaching outside of booths in a

public park during a public festival. *Bays v. City of Fairborn*, 668 F. 3d 814, 823, 825 (6th Cir. 2012). Acknowledging an interest in pedestrian traffic flow could be significant, the appellate court held the policy barring expressive activity was not narrowly tailored to serve this interest. *Id. See also Johnson*, 729 F.3d at 1099-1101 (ban on literature distribution outside booths not considered narrowly tailored); *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 577 (9th Cir. 1993) (ban on hand-billing in specific limited areas of public park not justified by interest in avoiding congestion in often crowded spaces).

Moreover, § 50-45's effect on Siders' leafletting and conversation "imposes an especially significant First Amendment burden." *McCullen*, 573 U.S. at 489. Going further than any reasonable interest could warrant, Brandon's application of § 50-45 is not narrowly tailored to meet any such interest, including that of public safety.

In denying Siders' motion for preliminary injunction, the district court held regulation of "street preaching" would be appropriate. (ROA. 621; RE. 30).[3] Yet Siders does not preach or seek to preach. (ROA. 8). As she made plain in the proceedings below, she wants to share the gospel through signs, literature,

---

[3] The district court relied on *Herridge v. Montgomery County*, No. 21-20264, 2022 WL 989421 (5th Cir. April 1, 2022). There, this Court affirmed a lower court ruling to the extent it upheld a ban on preaching at an intersection but reversed and remanded to consider the effect on sign-holding and leafletting. *Id.* at *1.

expressive t-shirts, conversation, and prayer. (ROA. 8, 27-28). Short of enjoining the ordinance in all applications, the district court could and should have granted her relief from the ordinance to the extent it applies to her precise forms of expression, allowing her to convey her religious message in the park. The application of § 50-45 to Siders' innocuous means of expression is not narrowly tailored to meet any legitimate end and warrants timely injunctive relief.

### b. displacing speech to a remote "protest" area with severe limitations does not leave open alternative channels of communication

Aside from content-neutrality and narrowly tailoring requisites, a valid speech restriction in traditional public fora must also leave open ample alternative channels of communication for the speaker and her message. *Perry*, 460 U.S. at 45. These requirements are conjunctive. *Bays*, 668 F.3d at 825.

The availability of some alternative does not equate to a viable alternative. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002). "The right to communicate inherently comprehends the right to communicate effectively." *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980). And an alternative is considered effective only if the option gives the speaker a chance to share her intended message with her intended audience. *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001). The limitation must leave the speaker with a meaningful "opportunity to win attention" of those she is trying reach. *Heffron,* 452

U.S. at 655 (citation omitted).

The bulk of event attendees cross Boyce Thompson Drive at the intersection with Rock Way as they walk from parking lots toward the amphitheater. It is for this reason that Siders wants to stand at the edge of the sidewalks or in the grassy areas on either side of this street to convey her message, in spots where she can adequately convey her message to pedestrian traffic. Brandon thwarts Siders' message by moving her message, forcing her to go to a remote box area some 300 feet away where she faces even more speech limitations, eliminating every conceivable means she has for reaching individuals attending events at the amphitheater.

Brandon subjects Siders to a new locale and conditions within it to keep her would-be audience from receiving her message. The repositioning causes Siders to lose leafletting altogether, for she cannot hand out literature to anyone without pedestrian traffic flow nearby. For the same reason, the change in venue prevents Siders from having conversations or praying with people. Moreover, the distance Brandon creates between Siders and the individuals she wants to reach makes expressive apparel useless, putting the messaging at too great a distance to be read.

Besides abolishing these vital means of communication, Brandon takes away the usefulness of Siders' signs and banners in the "protest" area by imposing a series of severe limitations on her sign use. Section 50-45(b)(6) bars any sign from having

25

an attached pole or stick, mandating "[a]ll signs be hand-held." This senseless rule undermines any possible efficacy of banners and signs in the remote box area. Banners, such as those employed by Siders, rise above eye level of people by design so they can be read from a distance. And a banner cannot stand up, indeed, cannot exist, without a pole. Signs are also more apt to draw attention and are easier to read from afar when they are elevated by a stick above eye level. The flat ban on poles and sticks cannot withstand scrutiny. *See Edwards*, 262 F.3d at 866-67 (holding ban on poles and sticks for signs failed to leave open ample alternative channels for speech).[4] The ordinance also precludes the elevation of signs by barring step stools in the box. And compounding the dilemma even further, the provision requires the top of a hand-held sign extend no higher than four feet above the height of the holder. Adhering to this arbitrary rule, Siders must either refrain from stretching her arms with a sign or use a smaller sign. In sum, she is prevented from using a banner or sign by any method that would make the written message readable from the space where she is forced to be.

Barring every aspect of her intended expression, the "protest" area alternative

---

[4] The prohibition on sign supports is also not a narrowly tailored measure. The only possible reason for outlawing sticks and poles – to keep these instruments from being used as weapons – is gutted by forcing Siders to remain in the isolated box. *See id.* at 863-66 (held ban on poles and sticks not narrowly tailored given lack of empirical evidence showing the ban was necessary to advance an interest in public safety).

is not ample or even viable for Siders.[5]

### c. regulation on "protests" is a content-based restriction

Plus, with its regulation on "protests" in § 50-45, Brandon improperly restricts Siders' content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based laws are disfavored and presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

A restriction is deemed content based if it contains facial distinctions relating to the message of the speakers, including provisions that treat the "function or purpose" of the speech differently. *Id.; see City of Austin v. Reagan Nat'l Adv. of Austin, LLC*, 142 S.Ct. 1464, 1474 (2022) (affirming "function or purpose" standard enunciated in *Reed)*. Section 50-45 implicates content with its regulation on "protests," an expressive activity characterized by its function and purpose, that being, the act of objecting or a gesture of disapproval.[6] One can conduct a protest in a wide array of manner, by public speaking, holding a sign, wearing expressive

---

[5] The district court did not mention the alternative means prong in its analysis. Elaborating on the omission on this and other arguments, the court said it "considered all arguments [and] [t]hose not addressed would not have changed the outcome." (ROA. 621; RE. 30).

[6] Definition of "protest" noun at www.merriam-webster.com/dictionary/protest (last visited October 3, 2023).

clothing, handing out literature, conversing one-on-one, a person can even resign in protest, but a protest is not a protest unless the content transmits disapproval of something.

In *Reed*, the Supreme Court held a law distinguishing between signs "designed to influence the outcome of an election" and signs "communicating a message or ideas for noncommercial purposes" was an impermissible content-based differentiation. 576 U.S. at 170. The Court reasoned that a law delving into the purpose of signage – whether to inform of an event, persuade someone to vote a certain way, or persuade someone to adopt an ideological viewpoint – is a content-based regulation because content ultimately determines whether the speech is curtailed. *Id.* at 171. *See also Blitch v. City of Slidell*, 260 F.Supp.3d 656, 668-69 (E.D. La. 2017) (relying on *Reed*, condemned an ordinance mandating a permit for panhandling while exempting other purposes for speech).

Much like the law condemned in *Reed*, § 50-45, with its explicit regulation of "protests," lets officials distinguish between content in determining whether to regulate speech. The existence of a protest is necessarily determined by the content of the communication, whether conveyed by signs, expressive clothing, literature, or oral speech. Brandon homes in on the function and purpose of speech with § 50-45, regulating the advocacy content of speech, committing what the Supreme Court denounces as "swapping an obvious subject-matter distinction for a 'function or

28

purpose' proxy that achieves the same result." *City of Austin,* 142 S.Ct. at 1474.

The content-based nature of the "protest" restriction is illustrated by Brandon's enforcement of it against Siders. Though she does not protest in the traditional sense, she shares the gospel, Brandon still applies the restriction to her, not because of what she does, but because of what she says (or what the City believes she will say). As stressed by Brandon in pleadings below, Siders' speech "fall[s] within the parameters of the subject ordinance[] [because her group had] conveyed a message of strong disapproval about drunkenness, sin, and abortion…." (ROA. 456, 491). Or put another way, application turns on content. Moreover, Brandon applies the regulation to Siders because of the expectation that passersby might place themselves in a nearby street to avoid exposure to the message. A speech restriction triggered by anticipated listener response is necessarily a content-based restriction. *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134 (1992).

Addressing the content-based contention, the district court declared: "Brandon's ordinance doesn't do that." (ROA. 613; RE. 22). Its legal analysis, though, does not back up the pronouncement. The court points to the preamble in § 50-45 stating Brandon will regulate "protests" in the restricted area "regardless of the content and/or expression thereof." (ROA. 35, 613; RE. 22, 31). Yet this verbiage does not assure content neutrality. To the contrary, the clause explicitly confirms the ordinance will regulate content, it just does not distinguish between

29

content it considers a protest.  The district court also mistakenly found the term "protest" is saved by the rest of the phrase "and/or demonstrations" since demonstrations concern public display of group feelings without delving into content. (ROA. 614-615; RE. 23-24).  The inclusion of the disjunctive conjunction "or" in the phrase undercuts this notion.  A "demonstration" is separate from and different from a "protest."  While a "demonstration" contemplates physical behavior that can be subject to reasonable regulation, a "protest" can function purely as speech, particularly, oppositional speech.

Quoting the *City of Austin* case, the lower court further claims Siders misinterprets *Reed*. (ROA. 613; RE. 22).  This deduction does not follow either.  In *City of Austin*, the Supreme Court was concerned about "stretch[ing]" the "function or purpose" test to invalidate as content-based any restriction that requires an examination of speech, noting that a "classification that considers function or purpose is [not] *always* contented based." 142 S.Ct. at 1474.  (emphasis in original). Still, the Court confirmed that the general rule espoused in *Reed* remains:  a restriction regulating the function or purpose of speech is generally considered a content-based restriction.  *Id*.  This principle holds true for Brandon's restriction on protests.

In a footnote, the district court erroneously relies on *Hill v. Colorado* in surmising that the word "protest" is "not automatically content based." (ROA. 615;

RE. 24). The *Hill* decision cannot be resuscitated and wielded to usurp the *Reed* "function or purpose" test. *See City of Austin*, 142 S.Ct. at 1475 (declining to resuscitate or cite *Hill*) *and* (Thomas, J., dissenting) ("The majority's refusal to acknowledge *Hill* simply underscores its defunct status…. Lower courts should take the majority's disclaimer at face value: *Hill* is a 'a decision that we do not cite'"). In any event, the *Hill* Court dealt with expressive activities linked to conduct, like picketing, demonstrating, and knowingly approaching individuals without consent. 530 U.S. at 707. It did not address pure speech like that associated with certain protests.

Encroaching on the content of speech, § 50-45's restriction on "protests" must overcome strict scrutiny, a bridge too far for the City. Brandon has no compelling interest in limiting protests, and even if a protest could be divined from Siders' religious speech, the City cannot show how a wholesale ban on this protected activity in traditional public fora is the least restrictive means for addressing any purported concern. *See Schneider v. Town of Irvington*, 308 U.S. 147, 160-65 (1939) (striking down a ban on literature distribution when town had other ways to prevent littering and fraud).

## B.    Brandon Violates Siders' Right to Due Process

The due process clause of the Fourteenth Amendment requires laws give citizens of ordinary intelligence "fair notice" their behavior could risk criminal

sanction. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Restrictions that are uncertain or vague allow enforcing officers to have undue discretion, leading to arbitrary and discriminatory application. *Id. See City of Lakewood v. Plain Dealer Pub'g Co.*, 486 U.S. 750, 760, 763-64 (1988) (noting how lack of explicit standards let officials discriminate on basis of viewpoint). The need for clarity is especially great when restrictions affect expressive activity because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone" and chill protected speech. *Grayned,* 408 U.S. at 109. *See Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499 (1982) (vagueness concerns are heightened when restriction covers expression).

Brandon's interpretation and application of § 50-45 is unduly vague in its regulation of "protests" and "demonstrations." The primary concern with these terms is that Brandon applies them to encompass religious speech. Siders does not intend to protest any scheduled event in the amphitheater or anything else while in the park. She also does not partake in a demonstration as that term is ordinarily used and understood. Nevertheless, in applying the ordinance to Siders, Brandon forces her to go to the protest area to conduct her speech as though she is actually protesting or demonstrating, even as it applies to her conversations and prayer.

In an analogous case, *SEIU*, this Court struck down a permit requirement for "public gatherings" due to uncertainty surrounding its enforcement. 595 F.3d at 605.

This Court did not consider the phrase "public gatherings" a mysterious concept but held the permitting scheme unconstitutionally vague because of the guesswork involved in applying the law, "perceiv[ing] no manner by which a group of reasonable persons… would know what they are obligated to do and to avoid doing." *Id*. The same problem exists with Brandon's application of § 50-45 to religious expression. Akin to *SEIU*, Siders does not have "fair notice" of what expression of hers is prohibited on a public sidewalk or public park under the threat of criminal sanction.

Another concern with regulating protests, as a matter of practical application, is that Brandon does not and cannot enforce the restriction literally and stop every person in the park who is expressing disapproval about something. Unable to enforce the ordinance according to its terms, the meaning is malleable, making enforcement subjective, rendering the ordinance unduly vague for this reason as well. *See City of Chicago v. Morales*, 527 U.S. 41, 57, 60 (1999) (holding anti-loitering provision vague because it did not ban all loitering and it was unclear which loitering was prohibited).

Siders does not wish to protest, demonstrate, or address social issues. Instead, she wants to share her Christian faith. She therefore cannot reasonably perceive from the language of § 50-45 how that ordinance applies to her speech. Brandon's application of it to Siders violates her right to due process.

## II.   SIDERS FACES SUBSTANTIAL IRREPARABLE HARM

Siders suffers a deprivation of her constitutional rights every time the Brandon Amphitheater hosts a concert or some other event, for each occasion represents a lost opportunity for her to convey her message to her intended audience.  She would visit the public spaces near the intersection of Boyce Thompson Drive and Rock Way in Quarry Park and share her Christian faith during these events but for Brandon's ongoing threat of citation and arrest under § 50-45.

This ongoing loss of constitutional freedoms constitutes irreparable harm for Siders.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).  When constitutional violations are demonstrated, as here, substantial harm is presumed.  *United States v. Hayes Int'l Corp.,* 415 F.2d 1038, 1045 (5th Cir. 1969).   By showing she will likely prevail on the merits of her constitutional claims, Siders establishes requisite harm.  *Opulent Life Church*, 697 F.3d at 295.

## III.  HARM TO SIDERS OUTWEIGHS ANY HARM TO BRANDON

Unlike the harm for which Siders perpetually suffers, Brandon would incur no appreciable harm if the preliminary injunction is granted.  Brandon would be obliged only to comply with constitutional requirements.

The City has no legitimate interest in banning religious speech – including sign-holding, literature distribution, expressive apparel, conversation, and prayer –

on public sidewalks and ways that remain free and open to the public.  *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (government has no legitimate interest in enforcing unconstitutional restrictions). Should the injunction issue, Brandon will remain free to restrict activities that truly threaten public safety.

## IV.  PRELIMINARY INJUNCTION WOULD NOT DISSERVE PUBLIC INTEREST

The preliminary injunctive relief Siders seeks against Brandon's unconstitutional application of its ordinance to her would make way for free expression in traditional public fora.  "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298.

## <u>CONCLUSION</u>

Siders asks this Court to reverse the decision below and instruct the district court to grant her Motion for Preliminary Injunction.

Respectfully submitted this 3rd day of October 2023.

/s/ Nathan W. Kellum
Nathan W. Kellum
TN Bar No. 013482; MS Bar No. 8813
CENTER FOR RELIGIOUS EXPRESSION
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485
(901) 684-5499 (fax)
nkellum@crelaw.org
Attorney for Appellant Spring Siders

## CERTIFICATE OF SERVICE

The undersigned hereby certifies the foregoing Brief of Plaintiff-Appellant has been served on counsel for Defendant-Appellee, through the CM/ECF system this 3rd day of October 2023.

/s/ Nathan W. Kellum
Nathan W. Kellum

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,350 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 software in 14 point Times New Roman font.

/s/ Nathan W. Kellum
 Nathan W. Kellum
Attorney for Plaintiff-Appellant
Dated:  October 3, 2023