# United States Court of Appeals for the Fifth Circuit

_____

No. 23-60381

_____

Spring Siders,

*Plaintiff—Appellant,*

*versus*

City of Brandon, Mississippi,

*Defendant—Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:22-CV-614

_____

Before Smith, Wiener, and Douglas, *Circuit Judges.*

Jacques L. Wiener, Jr., *Circuit Judge*:

Plaintiff-Appellant Spring Siders sought to "share the gospel" outside of a public amphitheater in Brandon, Mississippi. The City of Brandon, Defendant-Appellee, had passed an ordinance restricting the right to protest and/or demonstrate near the Amphitheater. Siders challenged the constitutionality of that ordinance, but the district court denied her request for a preliminary injunction. We AFFIRM.

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2024

Lyle W. Cayce
Clerk

No. 23-60381

# I. Background

## A. Facts

The City of Brandon, Mississippi ("Brandon") owns and operates the Brandon Amphitheater, an open-air venue used for ticketed concert events, with a capacity of over 8,500. Since the opening of the Amphitheater in 2018, Brandon has been engaged in a "continuous review process" to "better provide for the efficient and safe flow of vehicular traffic and the safety of pedestrians and event attendees." That process included recommendations from police officers, city officials, and a third-party engineering firm. It resulted in the passage of Ordinance § 50-45, which reads,

**Sec. 50-45. Designating a Protest Area and Related Provisions Regarding Public Protests/Demonstrations During Events at the Brandon Amphitheater.**

(1) Three hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("Event") and one (1) hour after the conclusion of the Event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the Restricted Area shown in Exhibit "A" attached hereto, except in the designated protest area as shown on Exhibit "A" attached hereto.

(2) The Protest Area is available to individuals and/or groups during the time specified in Section (1) above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

(a) All individuals and/or groups shall be and remain wholly within the Protest Area while actively engaged in public protests and/or demonstrations. Vehicles are prohibited in the Protest Area;

(b) The use of lasers, blinking or blinding lights, elec-

tric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

(c) The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the Protest Area is located is prohibited;

(d) Libel, slander, obscenities [sic], and/or speech tha[t] incites imminent violence or law breaking is prohibited;

(e) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

(f) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited. All signs must be hand-held and shall not be affixed to anything in the Protest Area or otherwise affixed to the Protest Area. The top of any sign may not be elevated more than 4 feet beyond the height of its holder.

(g) Anything brought onto the Protest Area shall be removed within 75 minutes of the conclusion of an Event.

(h) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the Protest Area. The representative shall, when reasonably requested by the Chief of Police and/or his designee, provide photo identification.

Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the Protest Area photo identification and provide the same to the Chief of Police and/or his designee as and when reasonably requested. Requests for identification

No. 23-60381

by the Chief of Police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(3) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in Sections 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the Protest Area and is not be permitted to return to the Protest Area during the Event on the day of the violation and if the same individual violates the provisions herein again during an Event in the same calendar year, the individual shall be removed from the Protest Area and is not be permitted to return to the Protest Area during any Event for the remainder of that calendar year.

Exhibit A displays the following map:



In the past, protests and demonstrations in the Restricted Area have "caused and created an unreasonable distraction." Brandon claims that § 50-

No. 23-60381

45 is necessary because "traffic control officers and other venue personnel" are needed to direct vehicular and pedestrian traffic during events to "insure, as reasonably practical, the safety of event attendees and the general public."

Siders is a Christian who seeks to evangelize and share the gospel with others. **ROA.7-8.** She communicates her religious beliefs "through literature, signs, banners, expressive clothing, conversation, and prayer." She states that she "particularly likes to share the gospel on public ways near and outside of public events . . . because such occasions offer her an opportunity to reach a meaningful number of people with her message." One such example is the Brandon Amphitheater. Siders says that she can "find meaningful pedestrian traffic flow on days of amphitheater events as attendees walk toward the amphitheater."

In May 2021, Siders visited the Amphitheater on the evening of a Lee Brice concert. She, her husband, and a few others (including Gabriel Olivier, the subject of another case arising out of this incident[1]) arrived around 6:00 p.m., an hour and a half before the concert. The group brought with them gospel literature, expressive clothing with scripture messages, a hand-held amplification device, and various signs.[2] Soon after they arrived, they were met by the Chief of Police of Brandon, who handed them a copy of the ordinance. The chief "informed Olivier that the police ha[d] a 'special' spot set up for their 'protest' on the other side of the hill off of a sidewalk and out of traffic." "The chief added that the 'only big thing' for the designated spot was some unspecified limitation on amplified devices."

---

[1] *See Olivier v. City of Brandon*, No. 22-60566, 2024 WL 4797535 (5th Cir. Nov. 14, 2024).

[2] The signs varied. At least one spoke about abortion. Another read "Prepare to meet thy God." A banner read "repent or perish."

No. 23-60381

After praying, the group walked along the sidewalk bordering Parking Lot B until they reached the designated spot. They had anticipated the spot being closer to the "main entryway to the amphitheater" but did not see any marked-off area near that intersection. When they found the designated area, located on the grass between Boyce Thompson Drive and Parking Lot A, "Siders surmised [that] the area [was] not workable for her speech, being too far a distance from pedestrian traffic." For example, she contends that "[t]here is no adjoining sidewalk" on the street near the designated spot. Siders insisted that the distance from pedestrian traffic hampered her ability to effectively leaflet, converse, or pray with people and that the designated area's location nullifies expressive t-shirts because attendees are too far away to read them. The restrictions on poles, sticks, step stools and sign height prevented Siders and her group's effective use of banners and signs because "the flimsy nature and size of banners" renders them "unusable without poles." And the limits on amplification made preaching impossible, even though Siders herself does not preach.[3]

The group quickly abandoned the designated area and returned to the intersection between Rock Way and Boyce Thompson Drive where there is significant pedestrian traffic. From that new location, Siders could more readily interact with event attendees. However, the police chief soon "became aware that the [nearby] officer was unable to hear radio traffic because of the noise generated" by Siders's group. As he approached, he observed that Siders's group had recording devices and was obstructing the sidewalk, forcing pedestrians to walk around them and into the street. The chief told the group to go back to the designated protest area or leave the park. The chief then got out his handcuffs, looked toward Siders and others in the

---

[3] The ordinance limits audibility to 100 feet—allegedly half the distance to the nearest pedestrian traffic.

No. 23-60381

group, and asked them if they wanted to leave. Fearing arrest, Siders and her husband left.

### B. Procedural History

Siders wishes to return and "share her religious message" in the Restricted Area at the Amphitheater but asserts that she is "chilled and deterred" from doing so because of § 50-45. She sued the city and moved for a preliminary injunction, seeking to enjoin Brandon from enforcing the ordinance both against her and in full. Brandon moved for judgment on the pleadings or, in the alternative, for a summary judgment.

The district court denied both parties' motions. Relevant to this appeal, the district court observed that when a movant brings both a facial and an as-applied constitutional challenge, courts usually resolve the "narrower" as-applied challenge first. Ultimately, the district court held that Siders had not established likelihood of success on the merits "for the relief she seeks—an order enjoining enforcement of the full Ordinance" and thus denied the injunction.

In so holding, the district court relied on *Herridge v. Montgomery County*, a case involving facts similar to those in this one. No. 4:19-CV-4259, 2021 WL 1550344, at *7 (S.D. Tex. Apr. 20, 2021), *aff'd in part, vacated in part, and remanded*, No. 21-20264, 2022 WL 989421 (5th Cir. Apr. 1, 2022). *Herridge* involved a pastor who sought to "maximize his evangelistic opportunities by travelling to public areas near well-attended events such as public events and music concerts." *Id.* at *1 (cleaned up). He sued the county for alleged violations of his First Amendment rights relating to his "ability to stand on a specific sidewalk and grassy hill close to an intersection near the entrance" to a concert venue. *Id.* The court granted summary judgment to the county, but we reversed in part and remanded regarding the pastor's right to leaflet. *See Herridge*, 2022 WL 989421, at *1. However, as to his oral

No. 23-60381

preaching, "we affirm[ed] for essentially the same reasons set forth by the district court." *Id.* Those reasons included (1) the county "provided evidence that Herridge's preaching does cause traffic congestion" and sometimes leads to physical altercations, and (2) when pedestrians slow down, it "creates the danger of congestion and causes risks to public safety if it takes place in the congested areas on the pathways southwest of the intersections where the Officers are working to keep pedestrians moving to the main gates." *Herridge*, 2021 WL 1550344, at *7.

Here, the district court relied on *Herridge*, observing that "the county could restrict some forms of street preaching during a concert for the same public-safety reasons Brandon cites." It therefore held that Siders was not substantially likely to succeed on the merits because Brandon was likely to show its ordinance was constitutional for the same reasons that the county did in *Herridge*. For reasons that we explain shortly, we see no problem with this reasoning.

## II. Jurisdiction

At oral argument, Brandon suggested that, because Siders had never attempted to pass out literature and engage in ministry on her own, as she proposes here and because the city never forbade her to do so, she has no standing to bring this challenge on appeal.

Even though the issue is not briefed, we must address it *sua sponte. See Doe v. Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001). "[A] credible threat of prosecution" is sufficient for standing. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010). "Whether the government disavows prosecution is a factor in finding a credible threat of prosecution[,]" however "that is only one factor among many." *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018). "Of course, the government's disavowal must be more than a mere litigation position." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th

No. 23-60381

Cir. 2010) (citation omitted).

The Brandon police chief "got out his handcuffs and looked towards Siders and others in the group" before proceeding to arrest two of them. That is as credible as a threat gets. And it is clear that Brandon intended to enforce the law, not only against the louder members of the group, but also against each one of them. That Brandon waffles on appeal on the behavior it might enforce does not mean that Siders loses her standing to bring this challenge. We agree with Siders's assessment that Brandon's position on appeal of this matter is "surprising and apparently driven by appellate strategies." And even if Brandon's equivocation were genuine, it is hardly unequivocal enough to constitute a disavowal of a credible threat of prosecution. *See Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021) (requiring "compelling contrary evidence" to overcome a presumption of future enforcement (citation omitted)); *see also Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023) (holding that a "disclaimed intent to penalize" is not compelling). Siders has standing.

### III. Standard of Review

We review the denial of a preliminary injunction for abuse of discretion. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (citation omitted). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam). To that end, "[w]hether free speech rights have been infringed presents a mixed question of law and fact reviewed *de novo*, and when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed *de novo*." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

A preliminary injunction is an extraordinary remedy. *Munaf v. Green*, 553 U.S. 674, 689 (2008). And "[o]nly under extraordinary circumstances will this court reverse the denial of a preliminary injunction." *Moore*, 868

No. 23-60381

F.3d at 403 (internal quotation marks and citation omitted). To obtain a preliminary injunction, one must demonstrate:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Anibowei*, 70 F.4th at 902 (citation omitted).

We hold that Siders cannot show a likelihood of success on the merits. We therefore need not reach the questions of whether she can satisfy the other factors necessary to obtain a preliminary injunction. *See Mock v. Garland*, 75 F.4th 563, 586-87 (5th Cir. 2023) ("Plaintiffs must satisfy the other preliminary injunction factors: There must be irreparable harm, and the balance of equities and the public interest must favor injunctive relief."). To satisfy that factor, Siders must show that she is likely to succeed in proving constitutional injury; in this case, that Brandon violated her First Amendment rights.[4]

---

[4] Some of our caselaw can be read to imply that plaintiffs alleging a constitutional injury have met their burden for a preliminary injunction by showing only that they suffered a constitutional injury. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (observing that the irreparable injury requirement automatically follows from such a showing because "the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury" (cleaned up)); *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (explaining that when evaluating the public interest factor, "[t]he government's and the public's interests merge when the government is a party"); *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (noting that "it is always in the public interest to prevent the violation of a party's constitutional rights" (internal quotation omitted)). Because we hold that Siders cannot satisfy the first factor for a preliminary injunction, it is unnecessary for us to comment further on the requirements for obtaining preliminary injunctions in constitutional cases.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000). "Although the plaintiffs bear the burden on the preliminary injunction factors, it is well established that the party seeking to uphold a restriction on [] speech carries the burden of justifying it." *Byrum*, 566 F.3d at 446 (cleaned up). That is true even when the restriction is content-neutral.[5] Thus, even though Siders must demonstrate a likelihood of success on the merits, the correct standard of review is "whether there is a sufficient likelihood [that Brandon] will ultimately fail to prove its regulation constitutional." *Id.* In other words, once Siders has demonstrated that the government is infringing her speech, she has presumptively carried her burden at this stage of the litigation unless the government can rebut that presumption.

## IV. Analysis

Siders has not demonstrated a likelihood of success on the merits. We begin with a narrower inquiry: whether the ordinance is unconstitutional as applied to Siders.[6] We conduct our analysis as follows: We first must determine whether Siders's speech is constitutionally protected, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); if we find that it is, we then "identify the nature of the forum, because the extent to

---

[5] *See, e.g.*, *Denton v. City of El Paso*, 861 F. App'x 836, 839 (5th Cir. 2021); *Sarre v. City of New Orleans*, 420 F. App'x 371, 377 (5th Cir. 2011).

[6] As we shall explain, there is inconsistent language used below and on appeal to characterize Siders's constitutional challenge. We conduct our analysis as though Siders brings an as-applied challenge, because, for a facial challenge to be successful, she must satisfy a higher bar: it must be established that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quoting *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

which the Government may limit access depends on whether the forum is public or nonpublic. Finally, we must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

This section is organized pursuant to that analysis. We first explain that Siders's speech is constitutionally protected speech. We next determine that the sidewalk outside the Amphitheater is a traditional public forum. We then find that the ordinance is content-neutral and proceed to apply intermediate scrutiny, ultimately holding that the ordinance is likely to be shown to be narrowly tailored and that there are likely ample alternative channels for expressive conduct. Because we ultimately conclude that "there is a sufficient likelihood [that Brandon] will [not] ultimately fail to prove its regulation constitutional," *Byrum*, 566 F.3d at 446, Siders has failed to carry her burden proving her own likelihood of success on the merits, so we AFFIRM the district court.

## A. Siders's Speech is Constitutionally Protected

The first question is whether Siders's speech is constitutionally protected. *See Cornelius*, 473 U.S. at 797. The Free Speech Clause protects "expressive religious activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). That extends to Siders's modes of communication: "[L]eafletting, sign displays, and oral communications are protected by the First Amendment. The fact that the messages . . . may be offensive to their recipients does not deprive them of constitutional protection." *Hill v. Colorado*, 530 U.S. 703, 715 (2000). Siders's speech is unambiguously protected by the First Amendment.

Brandon avers that Olivier's speech constitutes unprotected fighting words. Video footage reveals that Olivier called a passerby a "whore" and that physical altercations would have followed but for the swift intervention of law enforcement. But we need not consider Olivier's speech in evaluating

No. 23-60381

whether Siders's speech is constitutionally protected. *See United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (focusing on only the defendant's conduct when considering whether his speech was constitutionally protected). Even assuming arguendo that Olivier's past speeches are fighting words, it is only Siders's speech that matters when determining whether her speech is entitled to First Amendment protection as a baseline matter. Brandon's argument to the contrary is without merit.[7]

Because Siders has met her burden showing that her speech is constitutionally protected, the burden shifts to Brandon to show that it has a substantial likelihood of being able to demonstrate the constitutionality of the ordinance.

### B. The Relevant Location is a Traditional Public Forum

The level of protection afforded to speech depends on the nature of the forum. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 479–80 (1988). "There are three categories of forums, only the first two of which are relevant here: (1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757–58 (5th Cir. 2010).

It is axiomatic that "public sidewalks are traditional public fora that

---

[7] The closest Brandon comes is its reliance on a Third Circuit concurrence that explained, "While not all eight members of the Repent America group used fighting words, once fighting words have been uttered, the police can intervene to the extent necessary to defuse the situation and prevent a breach of the peace. The response of the police in this instance was reasonably calculated to accomplish that legitimate objective." *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (Stapleton, J., concurring). Even if that were binding, it would not control this case. Siders seeks a *prospective* injunction for *her* conduct. Even if the district court were to grant that injunction, it would not prevent the city from stopping Olivier from preaching outside the designated area, nor from "interven[ing] to the extent necessary to defuse the situation and prevent a breach of the peace" should unprotected speech incite such a breach. *See id.*

No. 23-60381

time out of mind have facilitated the general demand for public assembly and discourse." *Frame v. City of Arlington*, 657 F.3d 215, 227–28 (5th Cir. 2011) (en banc) (cleaned up). So too are public parks. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). Moreover, mere proximity to other kinds of government property does not cause traditional public fora to lose their character as such. "Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *United States v. Grace*, 461 U.S. 171, 180 (1983).

Brandon proffers several reasons for us to believe that the Amphitheater itself might be a limited public forum. But that is not the relevant inquiry. Instead, our focus is on the character of the *sidewalks outside* the Amphitheater. Brandon seems to recognize as much when, after describing the Amphitheater, it states that the "nature of the outside roads and sidewalks" matches the nature of the Amphitheater. It notes that "[d]uring events, the sidewalks and roads in front of the Amphitheater are primarily used for Amphitheater traffic." But that does not give the roads the character of the Amphitheater itself. Unlike the Amphitheater, the roads and sidewalks are generally open to the public. In the context of this case, a fleeting change in the primary use of a traditional public forum because of a nearby event does not deprive the forum of its ability to provide sanctuary for speech. *See Grace*, 461 U.S. at 180.

Brandon further points to *Sessler v. City of Davenport*, 102 F.4th 876 (8th Cir. 2024), *reh'g denied*, No. 22-3459, 2024 WL 3465362, at *1 (July 19, 2024), to suggest that, in some circumstances, traditional public fora might be transformed into limited public fora. That court suggested that "a fenced-off, vendor-occupied area of downtown … during a secular, commercial festival" which "undisputedly served as a 'traditional public forum' under

normal circumstances when fences were not erected" might be a limited public forum, but declined to decide the issue definitively. *Id.* at 878–79, 883–84. That case is inapposite for two reasons. First, the traditional public forum in that case was fenced off for the purposes of a specific event. *Id.* at 879. That is a meaningful distinction from the facts of this case, which concern public land abutting public roads without any fencing or demarcation. Second, even under the facts in *Sessler*, the Eighth Circuit pretermitted the question, noting that it was "difficult" and "unnecessary to resolve" in the context of that case. *Id.* at 883. To be clear, by ruling that the property at issue here is a traditional public forum, we do not articulate a *per se* rule against a traditional public forum's temporarily becoming a limited public forum, either by a physical adaptation of the space or by the nature of the event. That is just not what occurred here.

Moreover, *United States v. Kokinda*, 497 U.S. 720 (1990) (plurality), is readily distinct. In that case,

> [t]he postal sidewalk at issue [did] not have the characteristics of public sidewalks traditionally open to expressive activity. The municipal sidewalk that [ran] parallel to the road in this case [was] a public passageway. The Postal Service's sidewalk [was] not such a thoroughfare. Rather, it le[d] only from the parking area to the front door of the post office.

*Id.* at 727. That is to say, the sidewalk in *Kokinda*—because of its detachment from public roads and unique location—was *never* a public forum. In contrast, Brandon appears to concede that, at some point, the sidewalks here are a traditional public forum. However, it contends that the sidewalks "temporarily convert[] to a limited public forum during" events at the Amphitheater. Unlike the sidewalk in *Kokinda*, the sidewalk here "runs parallel to . . . a public passageway" and was not "constructed solely to assist [Amphitheater] patrons to negotiate the space between the parking lot" and

the Amphitheater. *See id.* at 727–28. Indeed, the Amphitheater is not the sole feature of the park. Someone in Parking Lot A might use the sidewalk in question to get to the baseball field across Boyce Thompson Drive; someone in Parking Lot B might use the sidewalk to enjoy a picnic on the field outside the Amphitheater. *Kokinda* stands for a narrow exception to the general rule and is not applicable here. We conclude that the sidewalks outside the Amphitheater are a traditional public forum.

### C. The Ordinance is Content-Neutral

To determine the level of scrutiny that applies to the constitutionality of the ordinance, we must assess whether the restriction is content-based. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Some laws clearly regulate speech "by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both … are subject to strict scrutiny." *Reed*, 576 U.S. at 163–64.

In *Hill v. Colorado*, the Supreme Court held that a statute

> mak[ing] it unlawful within the regulated areas for any person to knowingly approach within eight feet of another person, without that person's consent, for the purpose of passing a leaf-let or handbill to, displaying a sign to, or engaging in oral pro-test, education, or counseling with such other person

was content-neutral. 530 U.S. at 707, 725 (cleaned up). Siders characterizes this as *dictum*, functionally overruled by *Reagan* and *Reed*. But the Supreme Court has not overruled *Hill*—much to the chagrin of the dissenters in *Reagan. See* 596 U.S. at 86-87 (Thomas, J., dissenting). Because "we are

generally bound by Supreme Court dicta," *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016), *abrogated on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), the similarity between this ordinance and the statute in *Hill* is significant. Siders hardly makes any attempt to distinguish *Hill*.

Neither does Siders point to any part of *Reagan* that would be plainly contravened if we were to hold this ordinance to be content-neutral. *Reagan* circumscribed the scope of *Reed*'s "function or purpose" language. 596 U.S. at 74–75 (majority opinion). The Supreme Court was clear that *Reed* does *not* stand for the proposition "that any classification that considers function or purpose is *always* content based." *Id.* at 74 (emphasis in original). Thus, a regulation based on the "function or purpose" of speech is sometimes content-based, such as when it is a "proxy that achieves the same result" as a facially content-based regulation, *id.*, but a regulation based on "protest," without more, is not such an example. *See Hill*, 530 U.S. at 725; *see also id.* at 732 ("The statute only applies to a person who 'knowingly' approaches within eight feet of another … for the purpose of engaging in oral protest, education, or counseling. The likelihood that anyone would not understand any of those common words seems quite remote."); *Bruni v. City of Pittsburgh*, 941 F.3d 73, 84 (3d Cir. 2019) (holding that a regulation limiting "demonstrating" on sidewalks is content-neutral); *Phelps-Roper v. Ricketts*, 867 F.3d 883, 892 (8th Cir. 2017) (holding that a regulation limiting "picketing and other protest activities" is content-neutral). Brandon's ordinance is content-neutral, and we will not "stretch[] *Reed*'s 'function or purpose' language [so] far" to hold otherwise. *See Reagan*, 596 U.S. at 74.

### D. The Ordinance is Narrowly Tailored to Serve a Significant Government Interest

Because the ordinance is content-neutral, we apply intermediate scrutiny when we examine whether it is "narrowly tailored to serve a

No. 23-60381

significant government interest." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). "If 'a substantial portion of the burden on speech does not serve to advance' the ordinance's stated goals, then the ordinance is not narrowly tailored." *Knowles v. City of Waco*, 462 F.3d 430, 434 (5th Cir. 2006) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Alternatively put: "As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).

Brandon proffers a significant interest in public safety that Siders effectively concedes. The Supreme Court has repeatedly recognized the government's valid interest in "ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). The question then is whether a substantial portion of the ordinance's burden on speech fails to serve to advance that interest.

The parties disagree on what speech is relevant in the narrowly-tailored analysis. It is undisputed that some members of Siders's group used loud amplification devices, yelled offensive things at passers-by, and stood in the middle of the sidewalk to block pedestrians from passing, forcing pedestrians into the road and distracting law enforcement from their traffic control duties. However, the evidence does not show that Siders herself engaged in any of these practices. She stood "on the outer portion of the sidewalk or in the grassy curtilage and sp[oke] in a conversational tone." Thus, Siders argues, the ordinance is not narrowly tailored to *her* activities, because the burden on *her* speech does not advance Brandon's interests. Brandon, on the other hand, contends that we must consider the whole context of the protest and such protests in the aggregate, not just Siders's

No. 23-60381

individual actions. Brandon is correct.

The Supreme Court has spoken directly on this issue. In *Ward v. Rock Against Racism*, rock concert organizers challenged a New York City ordinance that required a city sound technician to control the mixing board during performances held at an amphitheater in Central Park. 491 U.S. at 787. One of the city's justifications for the regulation was ensuring "that the sound amplification [was] sufficient to reach all listeners." *Id.* at 800. The plaintiffs argued that the rule was not narrowly tailored to this interest as applied to them, organizers of rock concerts which are "characterized by more-than-adequate sound amplification." *Id.* at 801. The Supreme Court held that this fact was "beside the point, for the validity of the regulation depends on the relation it bears to the *overall* problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Id.* (emphasis added). "[T]he regulation's effectiveness," the Court wrote, "must be judged by considering *all* the varied groups that use the bandshell, and it is valid so long as the city could reasonably have determined that its interests overall would be served less effectively without the sound-amplification guideline than with it." *Id.* (emphasis added). Thus, Brandon's ordinance must be judged not only based on Siders's actions, but on "all the varied groups" that engage in protests and/or demonstrations at the Amphitheater during events. *See id.*

In that context, the regulations encompassed in the ordinance are narrowly tailored to furthering Brandon's interest in public safety. Looking only at Siders's group, they stood in the middle of the sidewalk while concert attendees had to walk into the street to avoid them. "Solicitation impedes the normal flow of traffic" because it "requires action by those who would respond." *Kokinda*, 497 U.S. at 733–34. The police were distracted from their traffic-control duties by Siders's group. The responding officer had to abandon the intersection where he was directing traffic to defuse tension

between Olivier and concert goers. These "repeated interventions . . . prevented [him] from keeping event attendees safe and out of traffic." As to the aggregate, the record reflects that Brandon studied the use of space during events like this one and concluded that pedestrian and traffic control was necessary to ensure safety. Brandon's substantial interest in public safety is served in a "direct and effective way" by the ordinance's protest and demonstration regulations. *See Ward*, 491 U.S. at 800; *see also Herridge*, 2021 WL 1550344, at *7. Absent these rules, the city's interest "would have been served less well," as evidenced by what happened with Siders's group. *See Ward*, 491 U.S. at 800. Section 50-45 is thus narrowly tailored to the "*overall* problem the government seeks to correct." *Id.* at 801 (emphasis added). Although Siders has the burden of establishing a likelihood of success on the merits, this requires Brandon to defend the constitutionality of its actions. It has done so.

As to the narrowly-tailored analysis, it makes no difference that Siders brings an as-applied, rather than a facial, challenge.[8] When evaluating whether the speech is protected, an as-applied challenge requires us to look only to the plaintiff. *See, e.g.*, *Perez*, 43 F.4th at 443. But the question here is whose conduct is relevant when we undergo the *narrowly-tailored* analysis: Do we ask whether the regulation is narrowly-tailored as to *Siders's*

---

[8] It is worth noting that in her briefing and below, Siders has characterized her challenge as both facial and as-applied. The district court order from which she appeals characterized the remedy sought as an injunction on "enforcement of the full Ordinance." On appeal, Siders describes the remedy she seeks as an injunction "against Brandon's unconstitutional application of its ordinance *to her*," and she refers to her facial challenge, at times, as a due process violation, insisting that the word "protest" is vague. However, as already explained, the Supreme Court has found it "quite remote" that "anyone would not understand" such "common words" as "oral protest, education, or counseling" and we see no reason to disagree. *See Hill*, 530 U.S. at 732. Her facial challenge, to the extent that it is based on a due process violation on vagueness grounds, is without merit.

individual conduct or as to "the overall problem the government seeks to correct[?]" *Ward*, 491 U.S. at 801. In *Ward*, the Court definitively said the latter, and it gave no indication that its narrow-tailoring analysis hinged on the facial versus as-applied nature of the claim. *Id.* When it conducted its narrowly-tailored analysis, the Supreme Court did not focus on the respondent's specific circumstances (rock concert organizers); it focused on "all the varied groups that use the bandshell." *Id.* The Court held that New York City's guideline was narrowly tailored to the city's interest in ensuring adequate sound amplification to all concertgoers at the bandshell. *Id.* at 800–01.[9] That is what we do here in finding that Brandon's application of § 50-45 to Siders is narrowly tailored to its interest in public safety and traffic control.[10]

---

[9] *See also Heffron v. Int'l Soc. for Krishna Consciousness, Inc. (ISKCON)*, 452 U.S. 640 (1981). The Court in *ISKCON* applied intermediate scrutiny to determine the validity of a time, place, and manner regulation, and reversed the court below, in part because it "took too narrow a view of the State's interest" when it conducted its narrowly-tailored analysis. *Id.* at 652. Specifically, the Court rejected measuring the validity of the rule by looking "solely to ISKCON" and instead looked to the overall problem the government sought to solve. *E.g., id.* ("The justification for the Rule should not be measured by the disorder that would result from granting an exemption solely to ISKCON. That organization and its ritual of Sankirtan have no special claim to First Amendment protection as compared to that of other religions who also distribute literature and solicit funds."); *id.* at 653 ("Obviously, there would be a much larger threat to the State's interest in crowd control if all other religious, nonreligious, and noncommercial organizations could likewise move freely about the fairgrounds distributing and selling literature and soliciting funds at will.").

[10] This is not the first time our court has considered the overall effect of a regulation in evaluating whether such regulation is narrowly tailored. *See LLEH, Inc. v. Wichita Cnty.*, 289 F.3d 358, 366 (5th Cir. 2002) ("To the extent the district court focused on the area in Babe's immediate vicinity, the court erred. 'Regulations that burden speech incidentally or control the time, place, and manner of expression must be evaluated in terms of their *general* effect.'") (quoting *United States v. Albertini*, 472 U.S. 675, 688–89 (1985)); *see also Moore v. Brown*, 868 F.3d 398, 404 (5th Cir. 2017) (per curiam) (explaining that the plaintiff "improperly frame[d] the inquiry" when he argued that a regulation requiring a permit to

No. 23-60381

Lest there be any doubt, *Ward* has been used as the relevant standard in as-applied cases as well. *See, e.g.*, *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 427, 430 (1993) (following, in an as-applied case, *Ward*'s teaching that "'the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case.'");[11] *see also Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 154, 156 (4th Cir. 2009), *cert. denied*, 558 U.S. 992 (2009) ("[W]hen cities exercise their power to zone the location of adult establishments, they need not show that each individual adult establishment actually generates the undesired secondary effects. … [T]he City of Charlotte does not have to show that a particular adult establishment generates adverse secondary effects each time it seeks to enforce the [regulation.]").[12] In another as-applied challenge, the Supreme Court weighed the conduct of others to assess whether a statute was narrowly tailored when the statute regulated fliers and billboards for the purpose of minimizing "visual blight." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808–10 (1984). One plaintiff's specific signs may not alone be sufficient to warrant a rule against signage, but when considering the potential impact of *all* posters, such rules are narrowly tailored to serve a city's interest in "eliminating visual clutter." *See id.* at 808.

---

bring structures over a certain size into a public park was not narrowly tailored because the defendants "fail[ed] to demonstrate how banning *his* sketch board furthers their safety interest") (emphasis added).

[11] While *Edge Broadcasting* involved commercial speech, it applied "[t]he *Ward* holding" because "the validity of time, place, or manner restrictions is determined under standards very similar to those applicable in the commercial speech context" and because commercial speech occupies a "subordinate position . . . in the scale of First Amendment values[.]" *Edge Broadcasting*, 509 U.S. at 430.

[12] *See also Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1134 (5th Cir. 2022) (applying *Ward* in an as-applied challenge).

It is true that whether the conduct of others is constitutionally protected is not relevant to whether any particular plaintiff's speech is constitutionally protected. But, per *Ward*, the conduct of others is relevant when considering whether the challenged regulation is narrowly tailored to the government's interest. That interest must be furthered by the rule such that it would be more difficult to achieve the government's goal without the restriction. *SEIU*, 595 F.3d at 596. And the regulation cannot "burden substantially more speech than is necessary to further" that interest. *Ward*, 491 U.S. at 799. Here, it would be more difficult to achieve Brandon's goal of public safety without this ordinance, even if regulating Siders's behavior in particular does not especially further that goal. *See Ward*, 491 U.S. at 803. Moreover, "narrow tailoring does not require that the least restrictive means be used." *SEIU*, 595 F.3d at 596.

There is not a sufficient likelihood that Brandon "will ultimately fail to prove" that § 50-45 is narrowly tailored to its interest in public safety. *See Byrum*, 566 F.3d at 446. Put differently, Brandon has sufficiently shown that it is likely to prove narrow tailoring.

### E. Ample Alternative Channels of Communication Exist

We turn now to the final inquiry in the intermediate scrutiny analysis. Brandon has the burden of showing that the ordinance "leave[s] open ample alternative channels of communication." *Perry*, 460 U.S. at 45. It is likely to succeed on this showing as well. Siders can "protest, demonstrate, preach, speak, [or] evangelize" anywhere outside of the Restricted Area, in any way that she chooses. Although Siders contends that she cannot reach her intended audience while speaking in the designated area, the government has proffered credible evidence to show that this contention is false. At events in 2021, on average, 244 people parked in the box office general lot, 400 people in Lot A, and 302 people in Lot B. Those who parked in the box office lot and

No. 23-60381

the front of Lot A would never walk by Siders, even at her desired location, given the direction of the Amphitheater from those positions. Lot B has only two pedestrian exits: one requires pedestrians to pass directly in front of the designated area, and the other to walk directly across the street from the designated area, approximately 40 feet away. Moreover, the Restricted Area does not reach the entire parking lot. Siders could engage in her desired speech between Lot B and Boyce Thompson Drive, directly on the pedestrian path from the lot. **ROA.70.** Even assuming that her audience would be slightly diminished in size, it would still be substantial, given that, on average, 302 people park in Lot B during events. As we have previously held, "an alternative venue for speech may still be constitutionally adequate, even when there is a reduction in the potential audience for speech in the alternative venue." *Int'l Women's Day March Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 372 (5th Cir. 2010) (internal quotation marks and citation omitted). Brandon has shown that it is likely to prove that Siders has ample alternative channels of communication, in the designated area and everywhere outside of the Restricted Area. We acknowledge that the district court denied summary judgment to Brandon, citing fact questions on this matter. However, at this stage of the litigation, we hold that there is enough evidence to show that Brandon is likely to succeed in proving this element. Whether the fact questions are ultimately resolved below in Brandon's favor is a question for another day.

## V. Conclusion

Because § 50-45 is likely narrowly tailored to Brandon's significant interest in public safety and leaves open ample alternative channels of communication, there is not a sufficient likelihood that Brandon "will ultimately fail to prove its regulation constitutional." *See Byrum*, 566 F.3d at 446. Siders has thus not demonstrated a likelihood of success on the merits of her First Amendment claim. Finding that factor fails, we will not engage

No. 23-60381

in a rote recitation of the remainder of the preliminary injunction factors. And, because the plaintiff has the burden of establishing each factor—which Siders has not done—Siders is not entitled to an injunction. *See Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 391 (5th Cir. 1984). The judgment of the district court is AFFIRMED.